UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BARRIE HOUSE COFFEE CO., INC.                    :
               Plaintiff,                        :
                                                 :
v.                                               :      **OPINION AND ORDER**
                                                 :
TEAMPAC, LLC d/b/a TEAM P.A.C. d/b/a             :      13 CV 8230 (VB)
PACKAGE AUTOMATION COMPANY, and                  :
DANIEL COAKLEY,                                  :
               Defendants.                       :
------------------------------------------------------------x

Briccetti, J.:

       Plaintiff Barrie House Coffee Co., Inc. ("Barrie House") brings this action against

Teampac, LLC ("Teampac"), and Daniel Coakley, arising out of defendants' alleged failure to

produce equipment capable of mass-producing plaintiff's single-serving coffee pods.  Plaintiff

brings claims against Teampac for breach of contract and breach of the duty of good faith and

fair dealing, against Coakley for fraud, and also seeks a declaratory judgment regarding the

existence of certain contractual obligations with respect to both defendants.

       In the present motion (Doc. #111), defendants seek dismissal of the fraud claim, and to

limit the damages on the fraud, contract, and good faith claims.

       As set forth below, defendants' motion is GRANTED in part and DENIED in part.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## BACKGROUND

       The parties have submitted briefs, statements of facts pursuant to Local Civil Rule 56.1,

declarations, and affidavits with exhibits, reflecting the following factual background.[1]

---

[1]     Because defendants have the burden to show no material disputes of fact exist, the Court
credits plaintiff's version of events where it is supported by citations to admissible record
evidence.  However, the Court feels compelled to note that plaintiff's Rule 56.1

I.      Factual Background

Plaintiff processes, packages, and sells ground coffee, tea, and other beverage products.

Defendant Coakley owns defendant Teampac, which designed and sold plaintiff equipment intended to package plaintiff's products into single-serving pods compatible with Keurig "K-Cup" pod brewing machines (the "Packaging Line").  Keurig brewing machines make single-cup servings of coffee, tea, and other beverages by pumping hot water through a small plastic pod containing coffee grounds, tea, or other ingredients.  See Keurig Brewer Support, http://www.keurig.com/support/k-cup-brewers (last visited June 27, 2016).

A.      Packaging Line Proposal

To improve flavor, plaintiff designed a pod capable of holding more coffee grounds than Keurig's K-Cup pod.  Plaintiff's pod featured a special filter and foil seals on both the top and the bottom.  K-Cup pods have foil seals only on the top.

Sometime in 2012, plaintiff and Coakley began discussing whether Teampac could manufacture equipment to mass-produce plaintiff's pods.  According to plaintiff, Coakley falsely represented he had prior experience designing systems to manufacture K-Cup pods.  Plaintiff cites no admissible evidence showing Coakley lacked this experience.[2]

---

Counterstatement of Disputed Facts (incorrectly styled a "Statement of Undisputed Facts," hereinafter "Pl.'s 56.1 Statement") is extremely troubling.  (Doc. #121).  Plaintiff frequently cites to evidence unsupportive of the proposition for which it is cited, or to deposition transcript pages not attached to the Declaration of Zahir A. Virani (Doc. #119, hereinafter "Virani Decl.") filed in opposition to the motion.  Moreover, plaintiff's responses to defendants' Rule 56.1 Statement routinely quibble over meaningless distinctions; offer nonresponsive, rather than contradictory, statements of fact; and unnecessarily repeat certain assertions ad nauseam.  This has made the Court's job in deciding the present motion unnecessarily burdensome, and raises doubts about plaintiff's candor to the Court.

[2]      Plaintiff cites a portion of Coakley's deposition, in which Coakley indicates he designed only one component of a K-Cup manufacturing system built for Keurig in the 1990s by a company called Rypac.  (Coakley Dep. at 8-11).  Plaintiff contends this shows Coakley had no other experience with K-Cup manufacturing systems, and had never designed an entire system.

One of plaintiff's requirements for the Packaging Line was a nitrogen flushing system. Coffee grounds become stale when exposed to oxygen, and air contains about 20% oxygen. For this reason, a nitrogen flushing system is used to remove most of the oxygen from the air inside of the coffee packaging. Plaintiff wanted the Packaging Line to produce pods containing no more than 2-3% residual oxygen, which plaintiff claims is the industry standard. According to plaintiff, Coakley was familiar with this industry standard, and knew from his past dealings with plaintiff that plaintiff required all its coffee packaging to meet this standard. Plaintiff claims it told Coakley the Packaging Line needed to meet all industry standards, including this one. Moreover, David Goldstein (plaintiff's current CEO) claims Coakley orally promised to achieve 3% residual oxygen, but Goldstein does not remember when Coakley said this.

Coakley and Teampac began working on a proposal for the Packaging Line to submit to plaintiff. Coakley found subcontractors to build several components of the Packaging Line. At some point, Coakley brought David Goldstein to visit an unnamed subcontractor's factory on Long Island, but Coakley did not ultimately hire this unnamed subcontractor. Instead, Coakley hired a subcontractor called PacTec to manufacture most of the Packaging Line. Plaintiff claims it did not know the extent to which PacTec would be involved in manufacturing the Packaging

---

But this inference is unsupported by the record. Coakley testified that, prior to forming Teampac in 2005, he did not design any other systems or components for the manufacturing of K-Cups. (Id. at 10). Later in his deposition, Coakley testified that he did design a K-Cup system for Green Mountain Coffee Roasters. (Id. at 161).

Plaintiff also cites the Declaration of David Goldstein to claim Coakley lacked experience designing K-Cup systems, but Goldstein apparently lacks personal knowledge of this fact. (Goldstein Decl. ¶ 5 ("During the course of this litigation, it became clear that [Coakley] had no such experience.") (emphasis added)). Therefore, Goldstein's testimony on this point is not admissible. See Fed. R. Evid. 602, 802.

Line when plaintiff accepted Teampac's proposal.[3]  Plaintiff contends Coakley hired PacTec because it was cheaper than the unnamed subcontractor on Long Island, a fact Coakley allegedly failed to disclose to plaintiffs.

On August 2, 2012, Coakley sent Teampac's proposal to David Goldstein and Ronald Goldstein, plaintiff's current COO, attached to an e-mail.  The proposal describes, among other things, the specifications of the Packaging Line, the pricing, and the terms of payment.  The e-mail attaching the proposal also discusses certain aspects of the Packaging Line.  Four aspects of the proposal are important to the present motion.

First, under "Product Handling Equipment Required," the proposal lists "Nitrogen Flush" (Ex. F to the Declaration of Craig M. Cepler in Support of Defendants' Motion for Summary Judgment (hereinafter "Cepler Decl.") at 1), and under "Sealer," the proposal lists "Nitrogen flush system prior to heat sealing."  (Id. at 5).  Neither the proposal nor the e-mail attaching it explicitly promises a particular level of residual oxygen.

Second, again under "Product Handling Equipment Required," the proposal indicates "Speeds of up to 240 cups per minute index speed (depending on product, components and materials supplied)" (Cepler Decl. Ex. F at 1), and under "Sealer," it lists "Speeds of up to 240 cups per minute (depending on product fill time)."  (Id. at 5).  Moreover, in the e-mail attaching the proposal, Coakley lists under "Production Expectations" "240 cups per minute x 400 minute shifts = 96,000 cups per shift x 3 shifts = 288,000 per day x 5 days = 1,440,000 per week x 50 weeks = 72,000,000 cups per year."  (Cepler Decl. Ex. E).

---

[3]     The operative Third Amended Complaint contends PacTec lacked experience manufacturing this type of coffee pod, and that Coakley never disclosed this to plaintiff, but plaintiff submits no evidence in opposition to this motion to support that contention.

Third, the proposal sets forth the conditions under which plaintiff had to pay Teampac for the Packaging Line.  Plaintiff was to pay $1,267,595 in the following installments: 50% with plaintiff's purchase order, 25% eight weeks later, 20% upon the "last independent Factory Acceptance Test[] – Prior to shipment," and "5% upon installation not to exceed 30 days." (Cepler Decl. Ex. F at 6).  On April 30, 2013, Coakley confirmed in an e-mail to one of plaintiff's employees that the second-to-last installment of 20% need not be released to Teampac "until we have a successful 'FAT' – Factory Acceptance Test."  (Virani Decl. Ex. 23).

Finally, the proposal contains a provision limiting plaintiff's remedy ("sole remedy clause"):

> REMEDY: A) All claims must be made within twelve (12) months of delivery to the original user.  Upon satisfactory proof of claim by Purchaser, TEAM PAC will, within a reasonable time, make necessary repairs or replacements; or where the foregoing are deemed by TEAM PAC to be commercially impractical, refund the purchase price upon return of the products. . . . Except for the following, TEAM PAC will not pay any consequential or incidental costs involved in repair or replacement, such as field labor and equipment costs.  If TEAM PAC declares a defect to be a "Major Failure" (as defined herein), TEAM PAC will provide warranty labor at no charge to Purchaser.  Generally, Major Failure is defined as (a) unusual and repetitive failures of component parts, and/or (b) failure of a system installed by TEAM PAC to meet the operating rates specified in TEAM PAC proposal.  Purchaser charges for repairs, replacements, or returns for credit will not be allowed unless authorized by TEAM PAC in writing.  TEAM PAC will not be liable for any of Purchaser's consequential or incidental damages, including, but not limited to, damages resulting from injury to person or property, loss of profits, loss of business reputation, downtime, or any losses or expenses that m[a]y result from a breach of this contract.  The foregoing remedy is SOLE AND EXCLUSIVE and states the full extent of TEAM PAC'S liability.  NO OTHER REMEDY WILL BE ALLOWED, WHETHER IN CONTRACT OR IN TORT.

(Cepler Decl. Ex. F at 8).

5

At some point before Coakley sent Teampac's proposal to plaintiff, Coakley spoke with Carl Peterson, the president of PacTec.  Peterson told Coakley he thought the nitrogen flushing system would not work with plaintiff's "crazy" pod design, and that PacTec could not guarantee it would reduce the residual oxygen in the pods to any particular percentage.  (Pl.'s 56.1 Statement ¶ 21).  Coakley never told plaintiff about this conversation.

Plaintiff also claims Peterson told Coakley that Peterson could not promise the Packaging Line would produce 240 cups per minute, and that Peterson understood "up to 240 cups per minute" to mean anywhere from zero to 240 was acceptable.  However, plaintiff cites to a page of Peterson's deposition that it failed to include in support of this motion, so this fact is unsupported.  Plaintiff cites no other evidence suggesting Coakley believed the Packaging Line would not produce 240 cups per minute when he sent plaintiff the proposal.

Plaintiff accepted the proposal and agreed to purchase the Packaging Line.  The proposal thus became the contract at issue in this case.

B.    Cartoning Machine

In February 2013, Coakley told plaintiff the Packaging Line would produce pods at a fast enough rate that plaintiff should purchase another piece of equipment from Coakley to group the individual pods into cartons for retail (the "Cartoning Machine").  Plaintiff claims to have relied on Coakley's assurance that the Packaging Line's output would be great enough that the Cartoning Line would be necessary.  In mid-February 2013, plaintiff ordered the Cartoning Machine from Teampac and provided a deposit.  Teampac sent plaintiff a proposal for the Cartoning Machine on May 9, 2013, which plaintiff accepted on May 17, 2013.  The price of the Cartoning Machine was $488,750.  Plaintiff cites to no evidence indicating Coakley believed on

May 9 or 17, 2013, that the Packaging Line's output would be significantly less than what Coakley represented to plaintiff.

C.    End of Production

In April, May, and June 2013, Coakley oversaw the final stages of production and the Factory Acceptance Test ("FAT") for the Packaging Line.  A FAT is a test run a manufacturer conducts at its facility to make sure the product works as expected under production conditions. According to plaintiff, a successful FAT requires "the machinery [to] operate continuously at its rated speed and without significant failures for a significant period of time."  (Pl.'s 56.1 Statement ¶ 32).  Plaintiff contends during this time, Coakley repeatedly misrepresented or omitted information to give plaintiff the false impression the Packaging Line was nearly complete and ready to ship.

Plaintiff characterizes Coakley's own notes dated April 24, 2013, as "demonstrat[ing] the nitrogen flushing system needed redesign including a liquid nitrogen nozzle spray system not in PacTec's design and never incorporated into the machine delivered to plaintiff."  (Pl.'s 56.1 Statement ¶ 31; Virani Decl. Ex. 21).  Coakley did not disclose this information to plaintiff. These notes also reflect Coakley's goal was to ship various components of the Packaging Line to plaintiff by May 6, 2013.  By May 6, 2013, no part of the Packaging Line had been shipped.

In an email dated May 13, 2013, Coakley told David Goldstein he was going to visit PacTec's factory to "[g]o over each function of the [Packaging Line] and see it work completely."  (Virani Decl. Ex. 18).  Specifically, Coakley listed "[n]itrogen flush, results" and "[c]onfirm speed, 240 per minute" as functions he wanted to check.  (Id.).  On May 17, 2013, Coakley e-mailed both Goldsteins indicating that, although the nitrogen flushing system did not

yet work, the mechanical part of the equipment was "98% complete" and the programming part was "95% complete." (Virani Decl. Ex. 19).  Coakley also recommended scheduling a FAT.

PacTec conducted the FAT at its factory on May 30 and 31, 2013.  Coakley and plaintiff's new employee, Bob Flittner, attended the FAT.  Plaintiff contends Flittner attended only to become familiar with the equipment, and that Coakley alone had plaintiff's authority to determine whether the FAT was successful.  Coakley determined that the FAT was not successful because PacTec was unable to operate the Packaging Line continuously or for a significant period of time, the way it was intended to operate in production.

Flittner told plaintiff the FAT failed on May 30, 2013, and both Goldsteins e-mailed Coakley to confirm this.  David Goldstein wrote on May 31, 2013, "NO DELAYS.  WE CAN'T AFFORD TO LOSE MORE TIME.  WE NEED THIS NOW."  (Cepler Aff. Ex. L).  Coakley responded, saying "David I realize the importance of the equipment I also realize the importance of it working well." (Id.).  In a subsequent e-mail on May 31, 2013, Coakley told Ronald Goldstein "it's imperative that this machine leaves right." (Virani Decl. Ex. 29).  Coakley also called David Goldstein on either May 30 or 31, 2013, and said the Packaging Line "would not ship until it was perfect." (Goldstein Decl. ¶ 35).

On June 1, 2013, Coakley e-mailed Peterson at PacTec, to say the May 30-31, 2013, FAT had failed and to identify several problems Coakley had observed.  In particular, Coakley observed the following components did not work: the bottom sealer; the infeed transfer; the registration; and the nitrogen flush.  Coakley also said there would need to be another FAT, and gave PacTec two days to fix these outstanding issues.  Coakley reminded Peterson the Packaging Line was intended to produce 240 cups per minute at full speed.

PacTec did not conduct another FAT before the Packaging Line was shipped, although the reason for this is not apparent from the record.

On June 4, 2013, Coakley e-mailed David Goldstein, saying "Carl [Peterson] is shipping today, he confirms working out the details of the bottom sealer infeed.  Please process the attached invoice for the ship payment for the line today."  (Cepler Decl. Ex. M).  Attached to the e-mail is an invoice for the outstanding balance of the 20% installment due prior to shipment, for $113,029.75.  Plaintiff paid the invoice.

        D.    <u>After Shipment</u>

When plaintiff received and assembled the Packaging Line, it did not work as promised.  The nitrogen flush system was ineffective, and due to many mechanical problems, including some that Coakley identified in the June 1, 2013, e-mail to Peterson, the Packaging Line never produced 240 cups per minute.  Plaintiff claims it gave Coakley and PacTec over two months to make the Packaging Line run correctly, but they proved "unwilling and unable to get [it] working as warranted and then refused to respond to [plaintiff's] requests for assistance."  (Goldstein Decl. ¶ 46).  Thereafter, plaintiff hired independent contractors to attempt to fix the Packaging Line, and broke off contact with Coakley and Teampac on September 7, 2013.

On November 6, 2013, plaintiff canceled the contract with Teampac and demanded a full refund.  Teampac refused.

Plaintiff paid 75% of the purchase price for the Cartoning Machine, but never received it.

Plaintiff continued to use the Packaging Line to produce pods.  All told, plaintiff was able to produce about two million pods using the Packaging Line, a small fraction of what it expected it would be able to produce based on the Packaging Line's product specifications.

II.    <u>Procedural History</u>

The Third Amended Complaint ("TAC") is the operative complaint.  In the Second Amended Complaint ("SAC"), plaintiff's fraud claim against Coakley did not allege Coakley fraudulently induced plaintiff to purchase the Packaging Line or the Cartoning Machine.  (SAC ¶¶ 41-47).  Rather, plaintiff claimed only that Coakley's misrepresentations and omissions induced plaintiff to pay the balance of the 20% installment when it was not due, as well as incur various expenses and obligations in reliance on the Packaging Line's performing as expected. (<u>Id</u>. ¶ 46).

In a bench ruling on March 23, 2015, the Court granted in part and denied in part defendants' partial motion to dismiss the SAC.  (Doc. #75).  The Court denied the motion to the extent it sought to dismiss the fraud claim against Coakley, but granted the motion to the extent it sought to dismiss the same claim against Teampac.

After that, plaintiff filed the TAC, which amended the fraud claim against Coakley.  Like the SAC, the TAC alleges Coakley fraudulently induced plaintiff to pay the balance of the 20% installment, as well as to incur several expenses and obligations in anticipation of receiving a working Packaging Line, including "ordering supplies and product, hiring and assigning staff to run the equipment, making commitments for delivery of finished product to customers, incurring debt and continuing to incur expenses and financing charges."  (TAC at ¶ 77).  Additionally, the TAC alleges Coakley fraudulently induced plaintiff to purchase the Packaging Line and the Cartoning Machine.

Defendants now move for summary judgment on the fraud claim, on the grounds that (i) the fraud claim in the TAC does not meet the heightened pleading requirements of Fed. R. Civ. P. 9(b); (ii) defendants have demonstrated there is no issue of material fact as to whether

Coakley committed fraud; and (iii) in the alternative, plaintiff's recovery on the fraud claim is limited to its out-of-pocket damages.  Defendants also move for summary judgment to limit the recoverable damages on plaintiff's breach of contract and breach of good faith and fair dealing claims to the sole remedy clause, or alternatively, as provided in the Uniform Commercial Code.

**DISCUSSION**

I.     Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d at 340.

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The

11

non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.    Fraud

The parties agree New York law applies.

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996)).  An omission is fraudulent "only if the non-disclosing party has a duty to disclose."

Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995).  A duty to disclose arises if (i) "the parties are in a fiduciary or other relationship signifying a heightened level of trust;" (ii) "one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party;" or (iii) "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."  Id. (internal quotation marks omitted).

One type of fraud is fraudulent inducement to enter into a contract.  This claim "arises from a promisor's successful attempts to induce a promisee to enter into a contractual relationship despite the fact that the promisor harbored an undisclosed intention not to perform under the contract."  Neckles Builders, Inc. v. Turner, 117 A.D.3d 923, 925 (2d Dep't 2014).  Such a claim is distinct from a breach of contract claim.  Id.  Similarly, a fraud claim may arise when a defendant makes "misrepresentations to induce [a] plaintiff['s] continuing performance."  Shaitelman v. Phoenix Mut. Life Ins. Co., 517 F. Supp. 21, 23 (S.D.N.Y. 1980) (emphasis added).

Although predictions typically cannot be fraudulent, a "relatively concrete representation as to . . . future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud."  Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994).

Plaintiff's single fraud claim against Coakley is better understood as alleging three separate but related sub-claims of fraud.  Plaintiff claims Coakley fraudulently induced it to (i) order the Packaging Line on August 2, 2012; (ii) order the Cartoning Machine in mid-February 2013; and (iii) pay the balance of the 20% installment on the Packaging Line prior to shipment in June 2013.  Moreover, plaintiff's claim that Coakley induced plaintiff to incur various costs and

obligations in reliance on the Packaging Line's performing as promised is best understood as

plaintiff's theory of consequential damages flowing from the allegedly fraudulent inducement to

enter into the contract.  Defendants argue none of these three alleged instances of fraud involves

a genuine issue of material fact, and in any event, that plaintiff's damages theory is unavailable

under New York law.  The Court addresses each of the three sub-claims in turn, as well as

plaintiff's damages theory.

      A.    <u>Ordering the Packaging Line</u>

There is a genuine issue of material fact as to whether Coakley fraudulently induced

plaintiff to order the Packaging Line, because a reasonable fact-finder could conclude Coakley

intentionally misled plaintiff into thinking Teampac could achieve a 2-3% residual oxygen level

using a nitrogen flushing system.

First, there is an issue of fact as to whether Coakley omitted information he had a duty to

disclose.  Plaintiff claims it told Coakley it required the nitrogen flush system to achieve the

industry standard.  According to plaintiff, Coakley knew this industry standard was 2-3%, and

knew from past dealings that plaintiff required a residual oxygen level in this range.[4]  Coakley

also knew from Peterson that PacTec could not guarantee the Packaging Line would meet this

requirement or that the nitrogen flushing system would work.  Yet, in the proposal, Coakley

promised plaintiff a nitrogen flushing system, albeit without guaranteeing any particular residual

oxygen level.  A reasonable fact-finder could determine that, given the previous discussions

---

[4]      David Goldstein claims Coakley explicitly represented he could achieve 2-3% residual oxygen.  However, Goldstein does not remember whether this conversation took place before or after the contract was entered into, or before or after Peterson allegedly told Coakley he could not guarantee any residual oxygen level.  Thus, the Court is unable to determine (i) whether this statement could have fraudulently induced the contract, or (ii) whether Coakley would have known it was false when he made it.  Nevertheless, this alleged conversation is some evidence Coakley understood both the industry standard and what plaintiff required.

about what plaintiff required, Coakley's unqualified promise of a nitrogen flushing system was "partial or ambiguous."  Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d at 1483.  Under these circumstances, Coakley would have had a duty to tell plaintiff what Peterson told him.

Second, there is an issue of fact as to whether Coakley knew he could not guarantee any residual oxygen level.  Coakley's conversation with Peterson is evidence he did.  Nor does it matter that Coakley purported to predict future events.  Although Coakley was making a representation about the Packaging Line's future performance, Peterson's statement to Coakley—that the nitrogen flushing system probably would not work with plaintiff's "crazy" pod design and could not guarantee any particular level of residual oxygen—is evidence Coakley knew "the represented level of performance [could not] be achieved" when he induced plaintiff to accept the proposal.  Cohen v. Koenig, 25 F.3d at 1172.

Third, there is an issue of fact as to whether Coakley made this omission to induce reliance.  There is evidence Coakley was aware plaintiff needed to achieve a 2-3% level of residual oxygen in its pods, but knew he could not truthfully promise this.  A reasonable fact-finder could conclude Coakley hid Peterson's concerns from plaintiff because he did not want plaintiff to reject Teampac's proposal.

Finally, there is an issue of fact as to whether plaintiff reasonably relied on this omission to its detriment.  According to plaintiff, the 2-3% residual oxygen level was a key requirement for the Packaging Line, because otherwise, plaintiff's product would go stale too quickly.  David Goldstein claims plaintiff would not have accepted Teampac's proposal if he had known about Peterson's concerns or that PacTec could not guarantee any particular residual oxygen level.

Instead, plaintiff accepted the proposal and agreed to pay Teampac to manufacture the Packaging Line.

Defendants' arguments to the contrary are unavailing.

Defendants claim it was unreasonable for plaintiff to rely on Coakley's statements and omissions about the residual oxygen level because the proposal was silent as to residual oxygen level, and when "a written instrument contains terms different from those orally or otherwise represented, a person is presumed to have read the writing and may not claim that he or she relied on the representations." (Def.'s Br. at 17, n.9, quoting Lewin Chevrolet-Geo-Oldsmobile Inc. v. Bender, 225 A.D.2d 916, 916 (3d Dep't 1996)). Defendants also cite this Court's decision in Swinson v. City of New York, 2015 WL 873390, at *3 (S.D.N.Y. Feb. 11, 2015), for this proposition.

Defendants' reliance on these cases is misplaced. In both cases, the plaintiffs' reliance was unreasonable as a matter of law because the written contracts expressly and unambiguously contradicted the alleged misrepresentations. Therefore, it was per se unreasonable for those plaintiffs to rely on the representations, rather than the contract. Here, by contrast, the proposal itself was arguably partial or ambiguous in light of the parties' previous discussions. There is a question of fact as to whether Coakley's omissions reasonably left plaintiff with the understanding that "nitrogen flushing system" meant "nitrogen flushing system that meets the requirements we discussed." Nothing in the proposal explicitly contradicts this understanding, so the Court cannot say as a matter of law it was unreasonable for plaintiff to understand the proposal this way.

Moreover, plaintiff's allegations satisfy Rule 9(b)'s heightened pleading requirement, because they identify (i) "what the omission[] w[as]" from the proposal, namely, that Coakley

could not guarantee a particular residual oxygen level; (ii) Coakley as "the person responsible for the failure to disclose;" (iii) "the context of the omissions and the manner in which they misled the plaintiff," plaintiff's discussions with Coakley about how it required the industry standard of 2-3% residual oxygen; and (iv) "what defendant obtained through the fraud," plaintiff's acceptance of the proposal.  See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), aff'd 2 F. App'x 109 (2d Cir. 2001) (summary order).

Because Coakley's statements about the nitrogen flush system support plaintiff's fraud claim regarding the purchase of the Packaging Line, the Court need not consider whether Coakley's other alleged misrepresentations or omissions—about his experience, PacTec's level of involvement in the manufacture of the Packaging Line, or the Packaging Line's ability to produce 240 cups per minute—were fraudulent.

Accordingly, summary judgment is denied as to the purchase of the Packaging Line.

B.    Ordering the Cartoning Machine

However, there is no genuine issue of material fact about whether Coakley fraudulently induced plaintiff to order the Cartoning Machine on May 17, 2013.[5]

Plaintiff claims Coakley fraudulently induced it to purchase the Cartoning Machine by promising the Packaging Line would be ready for production soon, and produce so many coffee

---

[5]    As explained above, plaintiff concedes it agreed to purchase the Cartoning Machine in mid-February 2013, but did not approve Teampac's proposal until May 17, 2013.  On the record before the Court, it is unclear when the deal for the Cartoning Machine was finalized.  Plaintiff relies on statements Coakley made after February 2013 to support this part of its fraud claim.  If the deal was finalized in February, plaintiff could not have relied on these subsequent statements.  Accordingly, the Court resolves this ambiguity in favor of plaintiff and assumes for the purposes of this motion that the deal was finalized on May 17, 2013.  Even assuming this, though, summary judgment for defendants is warranted.

pods that a separate machine would be necessary to package the pods into cartons.  This is a representation as to future performance, so it is only knowingly false if Coakley "kn[ew] that the represented level of performance [could not] be achieved."  Cohen v. Koenig, 25 F.3d at 1172.

Here, plaintiff has identified no admissible evidence showing Coakley knew the Packaging Line would produce pods more slowly than what he promised, either on May 17, 2013, or at any other time before plaintiff purchased the Cartoning Machine, notwithstanding Coakley's alleged concerns about the nitrogen flushing system in particular.  Nor has plaintiff offered any evidence showing Coakley knowingly misrepresented his understanding of PacTec's or anyone else's progress during this time.  Although Coakley's April 24, 2013, notes refer to redesigning the nitrogen flushing system, nothing in those notes suggests Coakley expected the Packaging Line to be delayed or to have trouble functioning.  Indeed, his notes reflect that, at the time, he expected to ship the equipment on May 6, 2013.  This belies any suggestion Coakley secretly knew in April 2013 that the Packaging Line would not be finished on time, yet told plaintiff it would be.

Therefore, a reasonable fact-finder could not conclude Coakley's statements on the subject of the Cartoning Machine were knowingly false.  Accordingly, defendants' motion for summary judgment is granted as to the purchase of the Cartoning Machine.

C.    Paying the Balance of the 20% Installment

There is a genuine issue of material fact about whether Coakley fraudulently induced plaintiff to continue to perform on the contract by paying the balance of the 20% installment on June 4, 2013, despite the fact that it was not actually due.  Specifically, a reasonable fact-finder could conclude Coakley's June 4, 2013, e-mail attaching the invoice misleadingly omitted

Coakley's knowledge that several of the issues from the May 30-31, 2013, FAT had not been resolved.

First, there is an issue of fact as to whether Coakley omitted information he had a duty to disclose.  Between April 30 and May 31, 2013, Coakley repeatedly told plaintiff the Packaging Line would not ship until it worked perfectly, even after the unsuccessful FAT.  Then, Coakley's June 4 e-mail mentioned an outstanding issue that had been fixed, and indicated the Packaging Line was ready to ship.  However, the Packaging Line's poor performance upon delivery to plaintiff suggests there were still problems with the machinery when Coakley sent this e-mail.  In this context, a fact-finder could conclude this e-mail misleadingly implied <u>all</u> the outstanding issues had been fixed, when they had not.  Under the circumstances, Coakley would have had a duty to disclose what he knew about whether the <u>other</u> outstanding issues had been fixed.  Yet, he said nothing.

Second, there is an issue of fact as to whether Coakley knew not all of the outstanding issues had been fixed when he sent the June 4 e-mail.  Coakley's June 1, 2013, e-mail to Peterson identified several of these issues and said another FAT would be necessary.  But no subsequent FAT took place, and there is no evidence Peterson ever told Coakley the outstanding issues had been resolved.  A reasonable fact-finder could conclude Coakley knew the issues had not been resolved before he told plaintiff the Packaging Line was ready to ship.

Third, there is an issue of fact as to whether Coakley intended to induce plaintiff's reliance on the June 4 e-mail.  Coakley submitted an invoice with this e-mail demanding payment of the balance of the 20% installment due upon the last independent FAT.  A reasonable fact-finder could conclude Coakley did this to prompt plaintiff to pay Teampac the balance of the

20% installment, thinking plaintiff would not do so if it knew there were still unresolved problems with the Packaging Line.

Finally, there is an issue of fact as to whether plaintiff reasonably relied on this statement to its detriment. David Goldstein claims he only paid the balance of the 20% installment because he understood the June 4 e-mail to mean all the issues with the Packaging Line had been resolved.

Defendants contend this sub-claim fails for several reasons. None is persuasive.

First, defendants argue Flittner's presence at the FAT made it unreasonable for plaintiff to rely on Coakley's omission that the FAT had failed. This misses the point. Plaintiff's claim rests not on Coakley's omission about the Packaging Line's various failures during the FAT, but rather his omission that most of these failures had not been addressed prior to shipment.

Second, defendants argue Coakley's June 4 e-mail never misrepresented to plaintiff that all the problems with the Packaging Line had been fixed, but rather only said the bottom sealer infeed had been fixed. However, as discussed above, in the context of Coakley's promises not to ship until the Packaging Line ran perfectly, there is an issue of fact as to whether the e-mail fraudulently omitted information about the other problems.

Third, defendants argue plaintiff did not rely on the June 4 e-mail to its detriment, and cites deposition testimony indicating plaintiff did not take action in response to this e-mail. But, as discussed above, plaintiff claims it paid the balance of the 20% installment based on this allegedly fraudulent omission. Any conflicting deposition testimony only raises a question of fact.

Finally, plaintiff's allegations satisfy Rule 9(b)'s heightened pleading requirement, because they identify (i) "what the omission[] w[as]" from the June 4 e-mail, namely, that

20

several problems with the Packaging Line had not been fixed prior to shipment; (ii) Coakley as "the person responsible for the failure to disclose;" (iii) "the context of the omissions and the manner in which they misled the plaintiff"–Coakley's repeated assurances the Packaging Line would not ship until perfect; and (iv) "what defendant obtained through the fraud," plaintiff's payment of the balance of the 20% installment that arguably was not due at the time.  See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d at 293.

Therefore, defendants' motion is denied as to the payment of the balance of the 20% installment.  For this reason, at this stage, the Court need not consider other statements or omissions plaintiff contends support this sub-claim.

> D.   Consequential Damages

Defendants argue plaintiff cannot recover expenses it incurred under the mistaken belief it would receive a working Packaging Line, specifically "ordering supplies and product, hiring and assigning staff to run the equipment, making commitments for delivery of finished product to customers, incurring debt and continuing to incur expenses and financing charges."  (TAC at ¶ 77).  Defendants characterize these damages as "lost profits" not recoverable under the "out-of-pocket" rule.  (Defs.' Br. at 26).  Defendants also argue plaintiff cannot recover attorneys' fees.

Defendants are correct about attorneys' fees but incorrect otherwise.

In New York, "[t]he prime standard for measuring [fraud damages] is the 'out of pocket' rule," under which "the loss is computed by ascertaining the difference between the consideration paid for the property and its actual value as affected by the consequences of the fraud."  Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc., 88 A.D. 461, 467 (2d Dep't 1982).  This rule prohibits "[r]ecovery of profits which would have been realized in the absence of fraud . . . because the defrauded party is entitled solely to recovery of the sum

necessary for restoration to the position occupied before the commission of the fraud." Id. at 468. However, the "out-of-pocket" rule does not preclude recovery of "other consequential damages proximately caused by reliance upon the misrepresentation," such as "expenditures which would not otherwise have been incurred." Id.; accord Fort Howard Paper Co. v. William D. Witter, Inc., 787 F.2d 784, 793 n.6 (2d Cir. 1986) ("[T]he out-of-pocket rule . . . permits recovery for a plaintiff's reliance interest, i.e., the costs incurred in preparation or in performance.") (internal quotations and alterations omitted). None of the cases defendants cite is to the contrary.

Ordering supplies, hiring staff, committing to deliver product to customers, and taking on debt and financing charges are not lost profits. Rather, these are "expenditures which [plaintiff] would not [have] incurred" had Coakley not fraudulently induced it to purchase the Packaging Line in the first place and then led plaintiff to believe the equipment was ready just before shipment. See Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc., 88 A.D. at 467. Plaintiff seeks only to be reimbursed for the expenditures it claims it made in reliance on Coakley's alleged misleading omissions. Therefore, the out-of-pocket rule does not bar plaintiff from recovering these types of damages.[6]

Attorneys' fees, however, are not recoverable here. New York law typically does not award attorney's fees in common law fraud cases. See Vaughn v. Consumer Home Mortg. Co., 470 F. Supp. 2d 248, 269 (E.D.N.Y. 2007) (citing Pope v. Saget, 29 A.D.3d 437, 443 (1st Dep't 2006)). This is because attorneys' fees are "incidents of litigation" that "the prevailing party

---

[6]      Plaintiff's opposition suggests its consequential damages should be measured by "the price Plaintiff's customers agreed to pay under existing contracts during the period of Defendants' ongoing fraud." (Pl.'s Br. at 26). In denying defendants' motion for summary judgment to limit plaintiff's fraud damages, the Court expresses no opinion on whether this is the correct way to measure consequential damages.

may not collect . . . unless an award is authorized by agreement between the parties or by statute or court rule." <u>A.G. Ship Maint. Corp. v. Lezak</u>, 69 N.Y.2d 1, 5 (1986).  Plaintiff has identified no such agreement, statute, or court rule.

Nor do plaintiff's attorneys' fees fall into the out-of-pocket rule's provision for consequential damages.  Plaintiff hired an attorney <u>after</u> the discovery of Coakley's alleged fraud, so the fees could not have been incurred in reliance on that fraud.  <u>See also</u> <u>3801 Beach Channel, Inc. v. Shvartzman</u>, 2010 WL 6471990, at *17-18 (E.D.N.Y. Sept. 30, 2010) (declining to award attorneys' fees as consequential damages in a common law fraud case).

The Court therefore denies defendants' motion to preclude recovery of consequential damages, but grants the motion to preclude recovery of attorneys' fees.

III.    <u>Contractual Limitation of Liability</u>

Defendants move to limit plaintiff's recoverable damages on its claims against Teampac for breach of contract and breach of the duty of good faith and fair dealing to that which is available under the sole remedy clause, quoted above.  <u>See</u> <u>supra</u> Background Part I.A.  In essence, the sole remedy clause provides that Teampac will repair or replace parts of the Packaging Line for free, or if it determines this would be commercially impractical, refund the purchase price upon return of the Packaging Line.  Additionally, if the Packaging Line experiences a Major Failure as defined in the sole remedy clause, Teampac will provide free warranty labor in an effort to fix it.  The sole remedy clause explicitly disclaims consequential and incidental damages, like lost profits, lost business reputation, downtime, or other losses or expenses resulting from breach of contract.

Defendants contend the sole remedy clause precludes <u>all</u> of plaintiff's recovery on the contract claim.  The argument is as follows: plaintiff seeks a refund of the purchase price of the

Packaging Line, as well as consequential damages.  But the sole remedy clause precludes consequential damages entirely, and precludes a refund unless Teampac determines repairs or replacements to be commercially impractical, which it did not.  Therefore, the argument goes, plaintiff is not entitled to any of the damages it seeks.

Defendants are correct as to consequential damages, but incorrect as to the availability of a refund.

Under New York law, a contract may restrict a buyer's remedy to "return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts." N.Y. U.C.C. § 2-719(1)(a).  Such a limitation is enforceable unless "circumstances cause [it] to fail of its essential purpose."  N.Y. U.C.C. § 2-719(2).  Moreover, sole remedy clauses excluding consequential damages are enforceable unless they are unconscionable.  N.Y. U.C.C. § 2-719(3). Nothing about this case would make enforcing this contract's bar on consequential damages unconscionable.  Therefore, the contract bars recovery of consequential damages in plaintiff's breach of contract claim.

The contract also bars consequential damages for the breach of the duty of good faith and fair dealing.  Under New York law, "breach of [the duty of good faith] is merely a breach of the underlying contract."  Fasolino Foods Co., v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotation omitted).  Contractual limitations on liability thus apply to good faith and fair dealing claims to the same extent they apply to breach of contract claims.  See Smile Train, Inc. v. Ferris Consulting Corp., 117 A.D.3d 629, 630 (1st Dep't 2014) (applying a contractually shortened statute of limitations); see also Canstar v. J.A. Jones Constr. Co., 212 A.D.2d 452 (1st Dep't 1995) ("[A] breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract.").

24

Plaintiff argues the sole remedy clause should not apply because plaintiff was fraudulently induced into making the contract, and a "defendant cannot be heard to rely on the provisions of a contract which was entered into as a result of fraudulent actions on defendant's part."  (Pl.'s Br. at 22 (citing 6A Corbin on Contracts § 1472 (1962)).

Plaintiff's argument is misplaced.  Plaintiff cites fraud and fraudulent inducement cases for the proposition that the sole remedy clause should not apply.  (Pl.'s Br. at 22-24).  But plaintiff's claim for fraud and fraudulent inducement is against Coakley, not Teampac.[7]  Therefore, Teampac may rely upon the sole remedy clause.

Accordingly, defendants have shown there is no material issue of fact as to whether damages beyond what is provided in the sole remedy clause are recoverable.  They are not.

However, plaintiff may still be entitled to the refund contemplated by the sole remedy clause.  According to plaintiff, Teampac failed to repair the Packaging Line in a reasonable time, as required by the sole remedy clause, and eventually refused to keep trying.  Under these circumstances, there is a question of fact as to whether Teampac determined repairs on the packaging line were commercially impractical, yet refused to refund plaintiff's purchase price.

Alternatively, if Teampac's alleged refusal to repair the Packaging Line despite plaintiff's complaints resulted in plaintiff being deprived of any remedy at all, then there is a question of fact as to whether the sole remedy clause "fail[ed] of its essential purpose" and is thus unenforceable.[8]  See N.Y. U.C.C. § 2-719(2).

---

[7]     Although the Court dismissed the fraud claim in the SAC against Teampac, this claim did not allege fraudulent inducement of contract; rather, it only alleged Teampac fraudulently induced plaintiff to pay the balance of the 20% installment.  Plaintiff has never brought a claim against Teampac alleging it fraudulently induced plaintiff to enter into the contract.

[8]     This would not, however, render the bar on consequential damages unenforceable.  See McNally Wellman Co., a Div. of Boliden Allis, Inc. v. N.Y. State Elec. & Gas Corp., 63 F.3d

For these reasons, the Court cannot conclude as a matter of law that plaintiff is not entitled to a refund of the Packaging Line's purchase price.

IV.     <u>U.C.C. Limitations on Damages</u>

Defendants argue in the alternative that plaintiff's damages are limited by the remedy provided by N.Y. U.C.C. § 2-714.  But this provision does not apply if the sole remedy clause does apply.  <u>See</u> N.Y. U.C.C. § 2-719(1)(a) ("[T]he agreement may provide for remedies . . . in substitution for those provided in this Article.").  Because the sole remedy clause may apply, the Court cannot say as a matter of law that N.Y. U.C.C. § 2-714 applies instead.

---

1188, 1197 (2d Cir. 1995) ("[A] limitation on incidental or consequential damages remains valid even if an exclusive remedy fails.").

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED as to the fraud claim with respect to plaintiff's purchase of the Cartoning Machine and to the extent defendant seeks to preclude the recovery of attorneys' fees.  The motion is also GRANTED to the extent defendant seeks to preclude consequential damages on the breach of contract and breach of good faith and fair dealing claims.  In all other respects, the motion is DENIED.

By August 1, 2016, the parties shall submit a joint pretrial order in accordance with the Court's Individual Practices.

All counsel shall attend a case management conference on August 4, 2016, at 10:00 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions.

The Clerk is instructed to terminate the motion.  (Doc. #111).

Dated: June 30, 2016
       White Plains, NY

                                        SO ORDERED:

                                        _____
                                        Vincent L. Briccetti
                                        United States District Judge

27